Ariosa Diagnostics, Inc. Mr. Linus, you have reserved 8 minutes in the course of rebuttal, correct? That's correct, Your Honor. And Mr. Fleming, you have 5 minutes for, you split your time, 10 and 5? 10 for the principle and 5 for rebuttal on the cross appeal, that's right, Your Honor. Okay. All right. Let's get going. Mr. Linus. Yes. Thank you, Your Honor, and may it please the Court. The District Court committed multiple clear errors in failing to enter an injunction in this case. The first one was finding that there was no competition between Roche and Illumina. And the record is overwhelming that there is, in fact, direct competition. Every sale made by Roche's Harmony test is a sale lost to an Illumina-powered test. In the red brief, Ariosa says that you waited 2 years after Harmony's launch to sue and didn't sink an injunction until 6 years afterward. Why? Well, I mean, we brought the case, I mean, first of all, they launched one product and then they changed the product and it was on the second product. But the fact is that the case took a long time because we had appeals and it was stayed over our objection, including lengthy IPR proceedings that we prevailed on. So basically, we faced an IPR, we argued, we made presentations of why that was irreparable harm, and the District Court nevertheless entered a stay over our objection. That was most of the time. So punishing us for winning an IPR when we got way late, I mean, in that sense, it's all the more important that we get the injunction. And the fact is that we did bring suit in 2012, so there was no initial delay. That's not what the record is going to support. And proceeding through trial on a busy court that stays your IPR seems hardly a basis to So the clear error is that there's Illumina-powered tests, which are basically 80 licensees. It lets everyone do this. It's broadly distributed to technology. Roche has its own test that competes. We put in the EIDL declaration that documents specific examples of where someone's deciding whether to buy the Roche test or to buy the solution from Illumina and bring it in-house. So they can bring it in-house, buy the equipment and platform from us, license the NIPT, and serve their own, like the military, for example, where Kiesler Armed Forces is one. So the declaration that's talking about the very specific direct competition, that was ignored by the court. And the court's statement that this isn't competition just defies common sense. On top of that, one of the products that is in the record is something called ACFS, which is a kit where they would sell, just like we do, for people to bring in-house the test themselves. So if you're a large institution, you buy the sequencing or the other technology that's a platform. You buy the NIPT technology. And then you have a kit. That's direct competition, a kit versus a kit. There's no way to even get confused about that. And the district court's conclusion was because it had originally concluded that Harmony unsold and a kit's not competitive, that can't be competitive either. So there's no basis at all to deny an injunction on that. That product's not been introduced in the U.S. They're waiting for this case to conclude. And that's direct competitive harm on an infringing product that should be stopped. The court also decided that the 794 patent that's been infringed by their home brew solution is part of our licensing program. But it's not. We license NIPT-specific technology. The 794 relates to platform. So it's platform versus platform competition. It's not that complicated to understand. It's just a clear error that she made, the court made. In addition, one of the arguments they made on the harms is the court said that it would be expensive for them now to move away from Illumina's platform. Well, that makes no sense. They're not using Illumina's platform. That's why we're here taking your time this morning. What Roche says is what instead the district court intended was the district court instead intended to say that it would be expensive for them to buy Illumina platform, which is what they'd have to do if they were enjoined. Well, that proves our whole point. If Roche would have to buy the Illumina solution in order to operate if they stop infringing, that's irreparable harm of the most classic form. I really think I could wax on about the importance of the right to exclude and the fundamental in this direct situation like this. Frankly, in litigation that's gone on and more because there's no clear answer to this, there's no stop infringing answer. But Judge Rayne's opinion in the Apple case sets it forth. District courts seem to be afraid by eBay or they just want to have products out there that people can use for this test. But the fact is that it's been demonstrated how the prices has come down. This whole NIPT technology is dramatically less expensive than amniocentesis. And there's no showing that that's the public interest. The public interest argument that she made is we don't continue to sell the Golden Gate product. The Golden Gate product is what the founders of Ariosa, the infringer, developed at our company. We sold the Golden Gate product. They bought the Golden Gate product when they were developing the infringing device. They bought our product. And then they substituted out for a homebrew that does the same thing. And that infringes. And we stopped selling the product when they dropped it afterwards when they started selling a homebrew. And the district court is saying that where it falls somehow. If you stop selling the product, how can there be competition? Because we're competing over a platform, because our sequencers compete with their assay. We sell other products that compete. No, but we're looking for direct competition where the sale by one is a loss of sale by the other. If you're not in the market for that particular platform, how can that be the case? And let me add to that question, too. Because you say in your reply in the yellow brief, I'm quoting, where an infringer ceases purchasing an embodying product to instead rely on an infringing homebrew, there is no public interest in requiring the patent owner to continue to offer the product commercially to obtain an injunction. You don't cite any authority for that proposition. So I'd like to add that to it. I just think it's common sense that if someone knocks off what you're doing, and then you stop selling your product, that shouldn't be held against you in an injunction. So you don't have any authority? No, just I'm relying on logic there for that one. On your question, Your Honor, is that there's multiple ways to perform the platform of the engine that runs the NIPT test, the platform. There's the sequencing solution that we sell that we sell to 80 different companies. And then what they're doing is they're instead using an assay, which can perform the same identification of nucleic acids. And they're knocking off our product, which we've stopped selling. And so every sale that they make of their test, which is using the infringing platform of this assay, is one less sale of an alumina-powered test that takes place. And our sequencing systems and our reagents and juices and all that. So I want to save time to respond, but it's just the classic injunction situation. And the judge obviously didn't want to, and strained and made multiple clear errors as a result. Well, an injunction situation could be a lot more clear than this is. I just don't think the platform versus platform is that complicated. Maybe it is. But it's just every sale of a test takes away from us because we supply the platform that allows people to operate. And in the case of ACFS, it is straightforward. They're selling a kit, platform, all the way to test. We do the same thing so people can take it in-house. They can in-house the process.  ACFS, it's classic. Thank you. Counselor, 10 minutes. Good morning, and may it please the Court. Mark Fleming together with Thomas Saunders on behalf of the cross appellants. We think the injunction request is meritless because there's no infringement. And there are three independent reasons for that, and I'll get to that when discussing the cross appeal. But there are other reasons to affirm the denial of the injunction. First of all, Illumina didn't prove a causal nexus between the 794 patent and the sales it wants to enjoin. In the district court, it had only a cursory footnote on the point, and it's easy to see why. Illumina doesn't use the 794 patent. It doesn't license anyone who does use it, and it didn't identify any expression of interest in the 794 patent. What about his argument that this isn't about the patentable product? It's more platform oriented? So that goes, I think, to some extent to the direct competition issue. And Illumina announced, and this is not disputed, that it was going to exit the retail market so as not to be in direct competition with Ariosa. The CEO, Mr. Flatley, said we're getting out of the business of selling tests directly. Ariosa's customers, I think it's important to understand this, Ariosa's customers He's arguing that there's competition downstream in the testing area. Right. So that's the difference, right? Illumina is selling not to doctors' offices or clinics, but to large labs that are doing the testing themselves. Ariosa's market is a retail market. We provide a service for doctors' offices who collect patient samples. They don't have the infrastructure to do the tests themselves. They send us the samples in San Jose. We test them. We send the results back. Ariosa is competing not against Illumina. Notice, it's important, whenever Illumina in its briefing says we compete, they say against Illumina-powered tests or Illumina products or Illumina partners. Whenever Your Honor hears that, that is a euphemism for Illumina's licensees. Illumina licenses its intellectual property to these big labs that do the testing. Those are Ariosa's competitors, not Illumina. This is Active Video. It's exactly the same situation. Active Video licensed Cablevision. Cablevision sold cable services. Verizon took away Cablevision's customers. That was not irreparable harm to Active Video because all Active Video was losing was licensing revenue from Cablevision. The same thing with respect to the reagents and juices that Mr. Reines was mentioning. Those are, if proven, they're product sales, quintessentially compensable by monetary damages. In this case, they weren't even proven. There's no identification of what they are in the opening brief. In the reply brief, there's just an undifferentiated site of 200 pages of agreements. There's no proof they can't be compensated by damages. There's no proof that they're due, if they're lost, to sales of Harmony version 2 because, again, if for some reason Harmony version 2 were to be enjoined, it's not as though a doctor is going to say, I'm going to open my own lab and provide my own testing in-house. They're just going to go to one of the other companies that is providing testing services. And to the extent there's a loss, that's a loss of licensing revenue to Illumina, not a loss of business. On page 16 of the red brief, you say, today the 794 is old technology. Illumina no longer manufactures products and practices, and, quote, virtually every other provider of DNA sequencing-based non-invasive prenatal testing uses different technology from that kind of 794. And you cite us to appendix 15343. And when I went to 343, it was a plaintiff's opposition to Arios' motion for judgment as a matter of law. And I'm looking at the language you quote, and it's a statement. It's unsupportive. You say CEG, docket, and so on. How on earth does that support your proposition? I think the point here, and I don't think this is disputed, Judge Wallach, is that the rest of the market, the accusation is that we are using the 794. Obviously, we don't agree with that. I'll get to that on the cross appeal. But the rest of the market is Illumina licensees who do not use, and Mr. Reines, I think, said this this morning. They don't use the 794. They use what they call the NIPT patent pool. Now, Mr. Reines was accusing Judge Ilston of misunderstanding the 794 as being part of the patent pool. You're not answering my question. I apologize. And my question is, how did you cite this page for that proposition? Well, we were citing, so beginning at line three, so first of all, this is their opposition, not our brief. Line three of this page says, As just one example, it is undisputed that Illumina and virtually every other provider of DNA sequencing-based noninvasive prenatal testing uses random sequencing techniques that, unlike Arios's dancer technique and the 794 patent, do not target specific sequences. So that's what we were referring to. And, again, I don't think it's disputed that they have a program that does not involve You answered my question. Thank you, Your Honor. I was just trying to pivot back to the main point. Because when I went to it, I didn't realize it was their point in session. I apologize. This is plaintiff's opposition to Arios's motion. We should have made that clear, and I hope I have. You're at your 10-minute mark. Thank you. I was hoping I could have 10 minutes to present our cross-appeal, and then I'd have five minutes for rebuttal on the cross-appeal. You still have time.  So with the Court's permission, unless there are more questions about the injunction, I would move to the cross-appeal, which is, of course, the injunction issue falls away if there's no infringement. And there are three independently sufficient reasons why there's no infringement. The first comes from claim elements E and F. And E requires taking the modified probes, which is a claim term, amplifying them using PCR, polymerase chain reaction, and forming different amplicons. And the district court construed that to mean amplification products of each of the different modified probes. And that's important because the modified probes are the big probes, the long probes that include the full sample, as well as the universal priming site, which is necessary in order to amplify them. And then step F says you immobilize said different amplicons. Now, there's no factual dispute about how our product operates, how Harmony version 2 operates. What gets immobilized is not an amplification of any of the modified probes, but a different thing called a readout cassette, which doesn't have any of the target sequence in it. It doesn't have a universal priming site. It's a completely different technology, which is why the district court did not suggest that there was any kind of literal infringement here. Illumina didn't draft claims directed to immobilizing and detecting fragments of amplicons formed in step E. It could have done that, but instead, it claimed immobilizing and detecting said different amplicons. And those are the things that are amplified in step E. Notably, there's no example in the patent whatsoever that contemplates immobilizing anything other than the full, big modified probes, and Illumina has never denied that. So this fight is about the doctrine of equivalence, and the most one could say is that the readout cassettes perform the same function as the said different amplicons do in the claims, but there is nothing about their being done in the same way or about it being done with the same result. So this is a case of an utter lack of proof. The other side has nothing beyond conclusory assertion. In result, they're different because the process works with the Harmony V2 process when you use the readout cassettes. It does not work when you use the full, big amplicons because if you were to put them together on this dense array, it would create something called steric hindrance where the molecules interfere with each other, and they can't bind. Dr. Oliphant testified to this without any contradiction. I have a question about a signer estoppel. Oh, all right. Yes, Your Honor. Specifically, on page 54 of the red brief, in a footnote, you reference Drs. Oliphant and Stoltenagle... Yes. ...making no general representation about the validity of future claims. That oath that Illumina required its employees to execute, which they did, weren't they the officers of the corporation at that point? Dr. Stoltenagle certainly was. Okay. I don't remember clearly about Dr. Oliphant, but I'm... And that was then prepared under his direction and control, right? You mean the text of the oath? Yes. I'm not sure the record says anything about that. Well, what I'm driving at is, isn't it proper to construe it against them given that they're responsible for its language? To the extent there were an ambiguity in it, then I suppose it might be. But I don't think this language is in any way ambiguous. It says the signers believe themselves to be the original inventors of the invention disclosed and claimed in said application. And there's, I don't think, any reasonable dispute that what was disclosed and claimed in the application at the time this document was executed is not what was claimed in the ultimate patent, which went through significant changes and became much broader at the time that it was actually issued long after Dr. Stoltenagle and Oliphant had executed their assignment. And that's why we think this is a situation where a signer estoppel is not properly applied, because what they're trying to do is take a representation about a narrow invention that required perfect complementarity and extend it to a much broader claim that seems substantial complementarily and not limited to perfect complementarity, which implicates different invalidity contentions. So that's why we rely on that. And we don't think there's any ambiguity that would require construing anything against them. If I could return to infringement, the issue about immobilizing the amplicons is important because it works on the one hand when you have the small readout cassettes which can fit together and they don't have the steric hindrance problem. Notably, Illumina's own expert, Dr. Cooper, said he had no basis to agree or disagree with Dr. Oliphant on this. So this is something where we would say we're entitled to judgment as a matter of law. Similarly, with respect to the readout cassettes being immobilized during the detection step, that is something the claims specifically require. They say detecting said different amplicons immobilized to said second solid support. Immobilized modifies amplicons. They have to be immobilized at the time of detection. Again, there is no dispute that in our system the amplicons are not immobilized at the time of detection. They've been washed away. So we're at the very least entitled to JMAL on this. But if we don't get JMAL, we're entitled to a new trial where we have a properly instructed jury that is told that the amplicons have to be immobilized at the time of detection. That's a request we made. The district court acknowledged it, but did not rule on it. So at the very least, we need a new trial on that one. If I might just take a moment, Your Honor, to deal with the final issue of non-infringement. Again, each of these is sufficient in and of itself to direct judgment as a matter of law of non-infringement. The first two elements of the claim, the first two limitations, have to be done in order. You first have to have sample strands attached to a substrate, and then they are contacted by the probes. And they have to be single-stranded when they're attached, and then all three probes have to connect with them and hybridize. That is the opposite of what happens in our product. In our product, the samples are swimming around in the solution. They have over a million probes per sample strand sitting there in solution. They contact each other, and then, and only then, are they attached to the substrate. It is the exact opposite. So Illumina's infringement theory depended on speculation. They say there's some sample strands that remain unattached in the solution. They then get bound down to the array, and then all of a sudden, and they've never explained how or why, all three probes attach to them at once in the very short period that is left. And there is absolutely no evidence,  There's no reason to think that it would happen. There's certainly no reason to think that a strand that remained unattached for two hours during the hybridization period that is specifically designed to have the probes contact them, that somehow, all of a sudden, once they are weighed down, all three of them would attach in the short period before the probes are washed away. And notably, our experts said without contradiction that the strands would be far less likely to bind once they were weighed down with the beads and attached to the substrate. That's on page 2394. So for any of one of those three reasons, we would respectfully submit the judgment of liability should be reversed, and if that happens, then there is no need to consider the injunction because there wouldn't be an injunction. At the very least, the denial of the injunction should be affirmed. And I'll reserve what's left of my time for rebuttal. Okay. Thank you. Thank you, Your Honor. The fact of competition is simply demonstrated by APPX 10363 where they list competition, and they say, Illumina, very large player with fast-growing testing strategy based on enabling labs to run VeriSeq, which is the competition. It's VeriSeq and Harmony. And beyond that is a detailed declaration at A10024 that talks about specific competitive situations. I mentioned the military. People are considering we're either going to bring it in-house and get the Illumina solution, which is a huge business opportunity for Illumina to sell sequencers and juice, or we're just going to send the test out and Ariosa can perform the test for us. So we bring it in, or do we send it out? Direct competition. And there's just pages of direct irreparable harm showing that was ignored totally that just can't... I just ask you, please, to just look back at the record. It's not that hard to figure out that there's direct competition here. They admit it. I give you a direct corporate strategy document and here's specific examples. Is it competition with Illumina or is it with the licensees? It's with the licensees, but that's where the difference from active video applies. In active video, it was a license, a naked patent license and a naked patent license. So this court said, well, the royalty, if you're not getting royalty from this one, you can get the royalty from that one. In this case, what counsel candidly admitted is what we're missing is sequencer sales, juice sales, relationships. And what Eidel explains is if people buy our solution to do their own NIPT tests, they can do cancer, they can do other things. Getting in the door at these clinical labs at Walter Reed to sell them your box of your sequencing system and then on top of that let them do the different applications is huge opportunities. This is big business and we're being... Isn't that different, you know, going to John Hopkins and making a sale there versus making a sale through some drugstore? It's not a drugstore. That's just false. People at Walter Reed, if they're not, if Walter Reed doesn't have this, it's not trivial to have this in-house, are sending out the test to Ariosa. They're sending... Okay. To Roche. What I meant to say is that you have sales or a license to a testing facility versus retail sales. Is that what's going on here? You can think of anything anyone does with our products as retail sales. When people buy the Illumina solution, they're running the test themselves, for themselves, or they're running the test to sell in competition with Harmony. So there's Harmony and then there's the Illumina-powered test, and there's just head-to-head competition. But we're not just losing a royalty. We're losing the relationships of selling the sequencers and selling the juice. And that's why we were able to submit an extensive declaration giving comparative situations at 10024 that squarely fall within what Judge Rayner was saying in the Apple case. Let me also say one thing. I'm going to take you away a little bit, but it's very narrow. If we agree with you that substantial evidence supports no anticipation on the 794, do we need to reach the Assigner-Estoppel? No. Okay. And you don't need to reach... There's also IPR-Estoppel here because they didn't make this argument, but you don't need to reach that either. And there's overwhelming evidence. But let me address the infringement, unless there's anything else on the injunction. I just ask you, please look at the record. This is direct competition. We're being denied an injunction for no reason. The analysis is just flawed. And there's multiple clear errors I hope I've conveyed. On non-infringement, really the focus, we ran through real quick some of them, but this cleaved amplicon point, okay? Basically, they take the amplicon and they cleave part off of it. The facts are undisputed in that sense. But what's not undisputed is that that's a step two question as to whether that satisfied the claim construction. The court's claim construction was replicated in a whole or part to yield amplification products of each of the different modified probes. That's undisputed. What they're essentially asking now is for a new claim construction that says it has to be the whole amplicon and not a cleaved amplicon. And the jury was able to look at the technical evidence in this case with expert testimony and say, we consider an amplicon that has part of it cut off to be a amplification product, which it obviously is. In fact, they're the ones in their own document at A4294 that coincidentally called their cleaved amplifications amplification product, A4294, which is the exact thing that's in the claim construction. It's too late for them to get a different claim construction that demands that every single nucleotide be on the amplicon for it to be considered a cleaved amplicon. And that's what they're seeking. And then there's doctrine of equivalence. They have patent applications on these cleaved amplicons that call them surrogates and we have testimony about, if you look at the Cooper testimony, that walks through the insubstantiality. The second thing that was argued was immobilization. It was very quick. I don't know if there's questions about that, but basically, if you look at the claim term, and the judge went through this multiple times, the district court, said, you have to, the fact that it is immobile you have to recognize because that's how the test works. But if you leave it an indicator that, okay, it was immobilized, it's enough that you can tell that it was immobilized. That's all that the claim requirement states. And then on the third one about this order of steps, boy, was that a superficial statement of the record. We put in extensive scientific testimony from Dr. Cooper that went through a Daubert review that was a protracted proceeding. The district court found it reliable. That's at A12003. They didn't appeal the Daubert. So they're acknowledging that as scientific testimony that the order of steps is met was reliable enough to be in and they're saying that it's somehow voodoo. And then they use this common term, no one's seen it. Well, oh, come on. I mean, of course, no one's seen it. No one's like, you know, in one of these crazy scientific movies where they can get down and see different nucleotides at the molecular level. You're almost out of time. I want to say two words to you. Assign a restopel. For us, assign a restopel, again, these people assigned all the rights. They've never brought any claim to say they're not inventors. And we demonstrated they are inventors. And they admitted they're trying to become not inventors or denying their inventorship because they want to avoid the assign a restopel doctrine. They went and made homebrew to our patent and are competing with our platform directly and were entitled to an injunction. The other thing I would just say, the last point I want to make is don't lose track of the supplemental damages issue. It's kind of quirky the way it came up. And the district court said she denied it but seems to really want to grant it and let us do it on remand. There's a lot of money because it's been a few years and this is big sales. And so we just have to make sure that we don't lose track of the supplemental damages issue. Thank you very much. That concludes today's article. I'm sorry. If I may. Yes, you may. I'll be very quick. Thank you. I appreciate the opportunity. Can I just, two things. Do you agree, I know you don't agree that substantial evidence supports the invalidity of the 794 but if we find it does, do we need to reach assign a restopel? No, Your Honor, you don't. And your friend's last point, it's clear or I just want to make sure it's clear on the record. You agree, assuming everything plays out the way it did below, that they're still entitled to supplemental damages and accounting or at least ask for it. They're entitled to ask for it. Not that they're entitled to it. So we think it's different as to pre-verdict versus post-verdict supplemental damages. Okay. And that's all something Judge Ilston, I think, should be given the opportunity to address. I just want to make sure you're not going to go back now and say she already rejected all that and she can't read. No, no. I think the right reading of what happened is that she deferred it until following this appeal to see if there ultimately was a judgment of liability at the end of it. I'd just make two points on the non-infringement, if I may. First of all, Mr. Reines is very careful to say he thinks readout cassettes are amplification products. But of course the claim and the claim construction are not satisfied simply by amplification products. It needs to be an amplification product of each of the different modified probes. That's page 15011. And that's important because the modified probes, as construed on 15009, have to contain a universal priming site. That's how they get replicated through polymerase chain reaction. That cannot happen to the readout cassettes. They do not have a universal priming site. They are not modified probes. Therefore, their amplification cannot make them amplicons as Illumina chose to claim them in its own claims. If they wanted to do something different, they could have tried to do it. They could have seen if they could have gotten those claims issued, but they didn't. As a result, we're not challenging the claim construction. We're perfectly content with the claim construction. The point is, they don't satisfy it and the way they're trying to convince this court that they do, or that Harmony Version 2 does, is by reading out the requirement of amplification products of each of the different modified probes. That is a critical component of the claim construction and by trying to get rid of it, they are trying to broaden the claim beyond what they actually recited. Regarding the first two limitations and the necessity of having the strands in the claims attached before they are contacted by the probes, which is the opposite of what we do, there's some kind of suggestion that we were required to appeal the Daubert ruling in order to appeal a Jamal denial. I know of no law that says that. The Supreme Court in Brook Group, this court in Endclass, has made very clear that if you are challenging the admissibility of expert testimony, you appeal the Daubert, but if you are challenging the sufficiency of the testimony to support a jury verdict, you appeal substantial evidence. In fact, the denial of the Daubert motion said, the judge said, I think this goes to weight rather than admissibility. We are appealing the weight. And here, the expert testimony as presented to the jury is not enough to allow a reasonable jury to find infringement. He never explained why once you have the strands bound down to the array all close to each other, all of a sudden, even though it took two hours and none, not one of the probes bound to the strand, the moment they had, they would have become double-stranded, not single-stranded as the claims require. The moment that they get bound down, supposedly they quickly get attached to by all three probes. There is no evidence, nothing Dr. Cooper, their expert said, remotely supported that that would happen. He never explained why it would happen. The uncontradicted testimony of our expert on 2394 says it was far less likely to happen. Also, Illumina has never explained why it would happen to 100 different probes, which the claims also require. It's a complete failure proof. We respectfully submit that the judgment of liability should be reversed. The denial of the injunction should be affirmed, and I thank the court for its time. Thank you. I thank all the party for their arguments this morning. This court is now in recess. All rise. The Honorable Court has adjourned